EXHIBIT 3

![FCC Seal]

# PUBLIC NOTICE

**Federal Communications Commission**
**45 L Street NE**
**Washington, DC 20554**

News Media Information 202-418-0500
Internet: www.fcc.gov

DA 25-601
Released: July 9, 2025

### DOMESTIC SECTION 214 APPLICATION GRANTED FOR THE
### TRANSFER OF CONTROL OF SUBSIDIARIES OF
### METRONET HOLDINGS, LLC TO METRONET SYSTEMS HOLDINGS, LLC

## WC Docket No. 24-244

By this Public Notice, the Wireline Competition Bureau (Bureau) grants, as conditioned, an application filed by Metronet Holdings, LLC (Metronet Holdings) and MetroNet Systems Holdings, LLC (MetroNet Systems) (together, Applicants), pursuant to section 214(a) of the Communications Act of 1934, as amended, and section 63.04 of the Commission's rules,[1] requesting consent for the transfer of control of Climax Telephone LLC (Climax), CMN-RUS, LLC (CMN-RUS), Jaguar Communications, LLC (Jaguar), Metro Fibernet, LLC (MFN), and Vexus Fiber, LLC (Vexus Fiber) (together, Licensees) from Metronet Holdings to MetroNet Systems, a joint venture controlled and co-managed by T-Mobile USA, Inc. (T-Mobile) and indirectly, by KKR Metro Parent LLC (KKR Metro) (the Proposed Transaction).[2]

On September 20, 2024, the Bureau released a Public Notice seeking comment on the Application.[3] The Bureau did not receive comments or petitions in opposition to the Application.

### Applicants and Description of Transaction

Metronet Holdings, a Delaware limited liability company, through its Licensees, provides or is authorized to provide telecommunications services, voice over Internet protocol services (VoIP), broadband services, and/or multichannel video programming services in certain portions of Arizona, Colorado, Florida, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Michigan, Minnesota, Missouri, Nebraska, Nevada, New Mexico, North Carolina, Ohio, Oklahoma, Texas, Virginia, and Wisconsin

---

[1] *See* 47 U.S.C. § 214(a); 47 CFR § 63.04.

[2] Joint Application for Consent to Transfer Control of Domestic Authority Pursuant to Section 214, WC Docket No. 24-244 (filed Aug. 8, 2024) (Application). Applicants filed supplements to the Application on May 16, 2025 and September 18, 2024. Letter from Nancy J. Victory, et al., Counsel for T-Mobile as future joint owner of MetroNet Systems, Catherine Wang, et al., Counsel for Metronet Holdings, MetroNet Systems, and Metronet Licensees, and Wayne D. Johnsen, et al., Counsel for KKR Metro as future joint owner of MetroNet Systems, to Marlene H. Dortch, Secretary, FCC, WC Docket 24-244 (filed May. 16, 2025) (May 16 Supplement); Letter from Nancy J. Victory, et al., Counsel for T-Mobile as future owner of MetroNet Systems, Catherine Wang, et al., Counsel for Metronet Holdings, MetroNet Systems, and Metronet Licensees, and Wayne D. Johnsen, et al., Counsel for KKR Metro as future joint owner of MetroNet Systems to Marlene H. Dortch, Secretary, FCC, WC Docket 24-244 (filed Sept. 18, 2024) (Sept. 18 Supplement). The Applicants also filed an application for the transfer of international authorizations. Any action on this domestic section 214 application is without prejudice to Commission action on other related, pending applications.

[3] *See Domestic Section 214 Application Filed for the Transfer of Control of Subsidiaries of Metronet Holdings, LLC to MetroNet Systems, LLC*, WC Docket No. 24-244, Public Notice, 39 FCC Rcd 10683 (WCB 2024) (Public Notice).

(Licensees' Territory).[4]  The Oak Hill Investors[5] and the Cinelli Investors[6] each have negative *de facto* control, or actual control of Metronet Holdings.[7]

CMN-RUS, a Delaware limited liability company, is designated as an eligible telecommunications carrier (ETC) in Indiana and provides services in Florida, Indiana, Illinois, Iowa, Kentucky, Michigan, Minnesota, Missouri, North Carolina, Ohio, and Texas.[8]  Climax Telephone, a Delaware limited liability company, is designated as an ETC and provides services as an incumbent local exchange carrier (LEC) and a competitive LEC in Michigan.[9]  Climax receives high cost support as an average schedule company.[10]  Jaguar Communications, a Delaware limited liability company, is designated as an ETC that provides services as a competitive LEC in Minnesota.[11]  Jaguar is authorized to receive $510,587.60 in Connect America Fund Phase II Auction (CAF Phase II) support to deploy voice and broadband service to 672 locations.[12]  MFN, a Nevada competitive LEC, provides services in Arizona, Colorado, Florida, Illinois, Indiana, Iowa, Kansas, Kentucky, Michigan, Minnesota, Missouri, Nebraska, North Carolina, Ohio, Oklahoma, Texas, Virginia, and Wisconsin.[13]  Vexus Fiber, a Delaware limited liability company, is designated as an ETC in Louisiana and is authorized to receive $8,923 in Rural Digital Opportunity Funds (RDOF) support to deploy voice and broadband services to 13 locations

---

[4] Application at 3.

[5] Applicants state that the "Oak Hill Investors" are affiliated with Oak Hill Capital Management and include OHCP MGP V, Ltd. (MGP V) and certain funds and entities that it controls, OHCP MGP IV, Ltd. (MGP IV) and certain funds and entities that it controls, and OHCP GenPar Super Holdco GP, Ltd. and certain and entities that it controls. *Id.* at 2, n.5.

[6] The "Cinelli Investors" include the following individuals and entities:  the 5 Talents Fund, LLC; Cinelli Dynasty Trust; the Albert E. Cinelli Jr. 2020 Grantor Retained Annuity Trust Dated December 23, 2020; the Albert E. Cinelli and Sharon A. Cinelli 2012 Revocable Trust, Dated January 20, 2014; the Cheryl Cinelli-Palermo 2020 Grantor Retained Annuity Trust Dated December 23, 2020; the Janet Marie Cinelli 2020 Grantor Retained Annuity Trust Dated December 23, 2020; the John P. Cinelli 2020 Grantor Retained Annuity Trust Dated December 23, 2020; Albert E. Cinelli; John Cinelli; and other family members.  All of the Cinelli Investors are U.S. citizens, trusts, or entities.  John Cinelli and Janet Cinelli are both U.S. citizens and are the Co-Trustees of the Grantor Retained Annuity Trusts.  *Id.* at 2, n.6.

[7] *Id.* at 2.

[8] *Id*. at 10, 17, 19.

[9] *Id.*

[10] *Id.* at 19; May 16 Supplement at 1.

[11] Application at 19.

[12] *Id.* at 19; Sept. 18 Supplement at 2.  *See* Universal Service Administrative Co., Tools, https://www.usac.org/high-cost/resources/tools/ (A-CAM, A-CAM II and CAF BLS Buildout Requirements).  *See Connect America Fund Phase II Auction Support Authorized for 593 Winning Bids*, AU Docket No. 17-182, WC Docket No. 10-90, Public Notice, 34 FCC Rcd 7081, 7111-115, Attach. A at 7-8 (Authorized Long Form Applicants and Winning Bids) (WCB 2019) (authorizing Jaguar to receive CAF Phase II support in Minnesota).  For current data for Auction 903 authorized recipients that bid to offer broadband at speeds of at least 100/20 Mbps (including Jaguar), *see* Broadband Funding Map, available at https://fundingmap.fcc.gov/home.

[13] Application at 11, 18.

in Texas.[14]  Vexus Fiber provides service as a competitive LEC in Arizona, Louisiana, New Mexico, and Texas.[15]

MetroNet Systems, currently a wholly owned subsidiary of Metronet Holdings, is a Delaware limited liability company that upon closing of the Proposed Transaction will be jointly controlled and co-managed by T-Mobile and Metronet Vexus Holdings, Inc. (Vexus Holdings), a Delaware corporation that will be an indirect subsidiary of KKR Metro.[16]  Applicants state that, post-consummation of the Proposed Transaction, T-Mobile will hold 50% of MetroNet Systems' voting membership interests and combined voting and non-voting membership interests, with Vexus Holdings owning 50% of the voting membership interests and approximately 49.69% of the combined voting and non-voting membership interests, and with current management of Metronet Holdings holding the remainder of the MetroNet Systems' non-voting membership interests.[17]

KKR Metro, a Delaware limited liability company, is indirectly owned and controlled by investment funds advised and/or managed by KKR & Co. Inc. (KKR), a Delaware corporation and global investment firm that is publicly traded.[18]  KKR Management LLP (KKR Management), a Delaware limited liability partnership, is the holder of the sole share of KKR's Series I preferred stock, which confers the right, among other things, to elect and remove members of KKR's board of directors.[19]  Founders Henry Kravis and George Roberts, each of whom is a U.S. citizen, when acting together, jointly control KKR Management.[20]  Applicants state that, aside from its existing minority interest in the Licensees, KKR currently does not have a 10% or greater interest in any domestic telecommunications services provider.[21]

T-Mobile operates as a nationwide provider of commercial mobile wireless voice, data, and fixed wireless broadband services to about 125.9 million subscribers.[22]  Applicants attest that T-Mobile does not provide the competitive LEC, incumbent LEC, or interexchange carrier telecommunications services or cable services offered by Licensees.[23]  T-Mobile is indirectly held by Deutsche Telecom AG (DT), a German corporation indirectly held by the Federal Republic of Germany.  DT, through wholly owned

---

[14] *Id.* at 11, 19; Sept. 18 Supplement at 2.  *See Rural Digital Opportunity Fund Support Authorized For 469 Winning Bids*, AU Docket No. 20-34, WC Docket Nos. 19-126 & 10-90, Public Notice, 36 FCC Rcd 14528, 14528, Attach. A at 21 (Authorized Long-Form Applicants and Winning Bids) (WCB 2021) (authorizing NTS Communications, LLC d/b/as Vexus Fiber to receive RDOF support in Texas).  For the most current RDOF authorization data, *see* Broadband Funding Map, https://fundingmap.fcc.gov/home.

[15] Application at 18.

[16] *Id.* at 4.  Following closing, the board of directors of MetroNet Systems will consist of two directors appointed by T-Mobile, two directors appointed by KKR Metro, and one independent director.  The independent director will be designated by KKR Metro, upon consultation with and the consent (not to be unreasonably withheld, conditioned, or delayed) of, T-Mobile.  *Id.*

[17] *Id.*

[18] *Id.* at 5.

[19] *Id.*, Exh. D at n.9.

[20] *Id.*, Exh. D at 14 (Proposed Ownership of MetroNet Systems and Licensees).

[21] May 16 Supplement at 1.

[22] Application at 4.  On March 28, 2025, the Commission granted a domestic section 214 application for the transfer of control of subsidiaries of the Lumos Fiber entities to Trailblazer Holdco, a joint venture equally owned and operated by subsidiaries of the EQT Infrastructure VI Fund and T-Mobile.  *See Domestic Section 214 Application Granted for the Transfer of Control of Subsidiaries of the Lumos Entities to Trailblazer Holdco, LLC*, WC Docket No. 24-151, Public Notice, DA 25-283 (WCB 2025).

[23] Application at 8.

subsidiaries, holds and votes the majority of T-Mobile shares.[24] Applicants state that, post-consummation of the Proposed Transaction, DT will have negative control of MetroNet Systems Holdings as a result of DT's controlled subsidiary, T-Mobile, holding a 50 percent member interest in MetroNet Systems Holdings.[25]

## Public Interest Analysis

Pursuant to section 214(a) of the Communications Act of 1934, as amended (the Act),[26] we must determine whether the proposed transfer of control to MetroNet Systems of authorizations held and controlled by subsidiaries of Metronet Holdings will serve the public interest, convenience, and necessity. We first assess whether the Proposed Transaction complies with the specific provisions of the Act, other applicable statutes, and the Commission's rules.[27] We then consider whether the transaction could result in public interest harms by substantially frustrating or impairing the objectives or implementation of the Act or related statutes.[28] Notably, the Commission has determined it may impose and enforce transaction-related conditions to ensure that the public interest is served by the transaction.[29] We next consider a transaction's public interest benefits. Applicants bear the burden of proving those benefits by a preponderance of the evidence.[30] As part of our public interest authority, we may impose conditions to

---

[24] *Id.* at 15 and Exh. C (Chart 9: Ownership Structure of Metronet Systems Assuming Completion of *Post-Closing Pro Forma Changes*).

[25] *Id.* at 15.

[26] 47 U.S.C. § 214(a).

[27] *See, e.g., Applications of Level 3 Communications, Inc. and CenturyLink, Inc. for Consent to Transfer Control of Licenses and Authorizations*, Memorandum Opinion and Order, 32 FCC Rcd 9581, 9585, para. 8 (2017) (*CenturyLink-Level 3 Order*); *Frontier Communications Parent, Inc. and Verizon Communications, Inc. Application for Consent to Transfer Control*, WC Docket No. 25-445, Memorandum Opinion and Order, DA 25-421, at 5, para. 9 (WCB, OIA, WTB 2025) (*Verizon-Frontier Order*); *Application of Verizon Communications Inc. and Straight Path Communications, Inc. for Consent to Transfer Control of Local Multipoint Distribution Service, 39 GHz, Common Carrier Point-to-Point Microwave, and 3650-3700 MHz Service Licenses*, Memorandum Opinion and Order, 33 FCC Rcd 188, 189, para. 5 & n.11 (WTB 2018) (*Verizon-Straight Path Order*); *Applications of GCI Communication Corp., ACS Wireless License Sub, Inc., ACS of Anchorage License Sub, Inc., and Unicom, Inc. for Consent to Assign Licenses to the Alaska Wireless Network, LLC*, Memorandum Opinion and Order and Declaratory Ruling, 28 FCC Rcd 10433, 10442, para. 23 & n.71 (2013) (*Alaska Wireless-GCI Order*).

[28] *See, e.g., CenturyLink-Level 3 Order*, 32 FCC Rcd at 9585, para 9; *Verizon-Frontier Order* at 5, para. 9; *Verizon-Straight Path Order*, 33 FCC Rcd at 190, para. 5; *Alaska Wireless-GCI Order*, 28 FCC Rcd at 10442, para. 23.

[29] *See, e.g., Applications of AT&T Inc. and DIRECTV for Consent to Assign or Transfer Control of Licenses and Authorizations*, Memorandum Opinion and Order, 30 FCC Rcd 9131, 9141, para. 22 (2015) (*AT&T-DIRECTV Order*); *Applications of Comcast Corp., General Electric Co. and NBC Universal, Inc. for Consent to Assign Licenses and Transfer Control of Licenses*, Memorandum Opinion and Order, 26 FCC Rcd 4238, 4249, para. 25 (2011); *Application of EchoStar Communications Corp., (a Nevada Corp.), General Motors Corp., and Hughes Electronics Corp (Delaware Corps.) (Transferors) and EchoStar Communications Corp. (a Delaware Corp.) (Transferee)*, Hearing Designation Order, 17 FCC Rcd 20559, 20575, para. 27 (2002) (*EchoStar-DIRECTV HDO*); *see also Application of WorldCom, Inc. and MCI Commc'ns Corp. for Transfer of Control of MCI Communications Corporation to WorldCom, Inc.*, Memorandum Opinion and Order, 13 FCC Rcd 18025, 18032, para. 10 (1998) (stating that the Commission may attach conditions to the transfers); *Applications of T-Mobile US, Inc., and Sprint Corp. for Consent to Transfer Control of Licenses and Authorizations*; *Applications of American H Block Wireless L.L.C., DBSD Corp., Gamma Acquisition L.L.C., and Manifest Wireless L.L.C. for Extension of Time*, WT Docket No. 18-197, ULS File Nos. 0008741236, 0008741420, 0008741603, and 0008741789 et al., Memorandum Opinion and Order, Declaratory Ruling, and Order of Proposed Modification, 34 FCC Rcd 10578, 10596, para. 42 (2019) (*T-Mobile-Sprint Order*); *Verizon-Frontier Order* at 5, para. 10.

[30] 47 U.S.C. § 309(e); *CenturyLink-Level 3 Order*, 32 FCC Rcd at 9586, para. 10; *Verizon-Frontier Order* at 6, para. 11; *Verizon-Straight Path Order*, 33 FCC Rcd at 190-91, para. 7; *Alaska Wireless-GCI Order*, 28 FCC Rcd at 10442, para. 23.

ensure for the public the transaction-related benefits claimed by the Applicants.[31]

A. Potential Public Interest Harms

Based on the current record, we find that there are no likely potential transaction-related public interest harms. Applicants state that "because the proposed change in ownership will occur at the holding company level and will not affect any of the operations or the legal entities of the Licensees, the Proposed Transaction will be entirely seamless to Licensees' telecommunications service customers."[32] Applicants further state that the transaction "will not result in any disruption of service, or change in customer service offerings, rates, terms or conditions."[33] Applicants also argue that the Proposed Transaction will not result in a reduction of competition, stating that "the Proposed Transaction will not eliminate any telecommunications provider and therefore does not pose any threat of anticompetitive effects in connections with any telecommunications service."[34] Applicants further state that "Metronet does not provide services in the ILEC service territories of Lumos," an affiliate of T-Mobile, and that "to their knowledge, no Lumos entity provides services in the ILEC service territory of Climax, the only ILEC subsidiary of Transferee."[35] We agree with Applicants' contentions and we find that the transaction will not result in any loss or impairment of service for either Applicant's subscribers and will have no adverse effect on competition.

We also find no harms associated with Universal Service Fund (USF) programs will arise from the Proposed Transaction. Applicants note that "the transaction will not result in any changes to management, technology, debt, access to resources, or other matters that would compromise the support recipients' ability to meet their USF high cost service obligations."[36] Applicants acknowledge that, as part of this transaction, the Licensees that are ETCs will "retain all public interest responsibilities of the USF programs to which each has committed, including all associated administrative, performance, and deployment obligations and deadlines."[37] Applicants also acknowledge that they must assume all such

---

[31] *See, e.g., Alaska Wireless-GCI Order*, 28 FCC Rcd at 10443, para. 26; *Applications of AT&T Inc. and Centennial Communications Corp. for Consent to Transfer Control of Licenses, Authorizations, and Spectrum Leasing Arrangements*, Memorandum Opinion and Order, 24 FCC Rcd 13915, 13929, para. 30 (2009); *Verizon-Frontier Order* at 6, para. 11.

[32] Application at 8.

[33] May 16 Supplement at 2.

[34] Application at 8.

[35] September 18 Supplement at 1-2

[36] May 16 Supplement at 2; Application at 7 (asserting that MetroNet Systems is managerially, technically, and financially qualified to assume control of Licensees).

[37] May 16 Supplement at 1; Sept. 18 Supplement at 2 (attesting that Jaguar will continue to meet its CAF II commitment and Vexus Fiber will continue to meet its RDOF commitments, post-consummation). The Bureau has provided a summary of the various obligations of authorized high-cost support recipients, including both obligations associated with an ETC status and obligations specific to the relevant program, in prior authorization public notices. As stated in these public notices, the lists in these public notices are not intended to be comprehensive, and all authorized parties are responsible for conducting the due diligence required to comply with USF requirements and the Commission's rules. *See, e.g., Rural Digital Opportunity Fund Support Authorized for 2,521 Winning Bids*, AU Docket No. 20-34, WC Docket Nos. 19-126 & 10-90, Public Notice, 37 FCC Rcd 171, 171-76 (WCB/OEA 2022); *Connect America Fund Phase II Auction Support Authorized for 593 Winning Bids*, AU Docket No. 17-182, WC Docket No. 10-90, Public Notice, 34 FCC Rcd 7081, 7082-86 (WCB 2019). In addition to fulfilling the legal and program-based obligations and requirements described in these public notices, RDOF support recipients must test and certify compliance with the relevant performance requirements in accordance with the uniform framework that has been adopted for measuring and reporting on high-cost performance requirements. 47 CFR § 54.313. Further, ETCs that are designated for the purpose of receiving high-cost support or designated for the purpose of

(continued….)

responsibilities and obligations, regardless of any preexisting or reasonably foreseeable conditions that could impact any of the entities' abilities to meet their legal obligations, including any technical, marketplace, and on-the-ground conditions.[38]  Applicants acknowledge that after consummation of the Proposed Transaction, the Licensees that are ETCs "will be responsible for any consequences for noncompliance, regardless of whether the circumstances giving rise to such consequences pre-date or post-date the consummation of the transaction, including default recovery of support and potential forfeiture penalties, in all supported areas."[39]  Applicants have also acknowledged the continuing applicability of the "mixed support condition" to Climax and certain affiliates post-consummation.[40]  Overall, we conclude that, based on the record, no public interest harms are likely to arise from the Proposed Transaction.

### B.  Potential Public Interest Benefits

We next review the potential public interest benefits of the Proposed Transaction.  The Commission finds a claimed benefit to be cognizable only if it is transaction-related, verifiable, and likely to flow through to consumers and not inure solely to the benefit of the company.[41]  Applicants state that the Proposed Transaction will "strengthen the financial position of Licensees by providing access to capital from new funding resources, enabling accelerated investment in the companies' networks and

---

[38] May 16 Supplement at 1.

[39] *Id.*

[40] Application at 15.  Applicants acknowledge that the Licensees are already subject to the "mixed support condition" adopted in the *Hargray/ComSouth Order* and that the "Hargray Conditions that currently apply to Climax will continue to apply after the close of the Transaction."  September 18 Supplement at 1.  The Commission has recognized that "mixed support" transactions involving companies that receive these different types of support raise the potential for transaction-specific harms arising from the combined entities' ability and incentives, post-transaction, to shift costs from its fixed support affiliates to affiliates receiving support on a cost basis (cost affiliates).  *See Joint Application of W. Mansfield Jennings Limited Partnership and Hargray Communications Group, Inc. for Consent to the Transfer of Control of ComSouth Corporation Pursuant to Section 214 of the Communications Act of 1934*, WC Docket No. 18-52, Memorandum Opinion and Order, 33 FCC Rcd 4780, 4784, para. 19 (2018) (*Hargray/ComSouth Order*) (directing the Bureau to impose a limited condition on transactions between parties receiving different types of support to cap high-cost universal service support based on the operating expenses of the cost-based companies).  In order to mitigate such potential harm, the Commission has directed the Bureau, in most instances, to condition approval of these transactions on the imposition of a cap, for a period of seven years from the consummation of the transaction, on cost affiliates' recoverable operating costs to prevent the combined entity from receiving "additional or inflated universal service support merely because of cost accounting that shifts costs."  *Hargray/ComSouth Order*, 33 FCC Rcd at 4789, para. 27.  The Commission also made clear that within this seven-year period, this condition would apply to both existing and newly acquired cost affiliates, as well as any rate-of-return affiliates that convert from compensation on an average schedule basis to a cost basis, upon such conversion.  *See Hargray/ComSouth Order*, 33 FCC Rcd at 4789, nn.72, 74; *Domestic Section 214 Application Filed for the Transfer of Control of Climax Telephone Company to MetroNet Systems Holdings, LLC*, Public Notice, WC Docket No. 21-377, 36 FCC Rcd 16151, n.4 (WCB 2021) (*Climax Public Notice*) (applying the mixed support condition to Climax if it converts from an average schedule company to a non-average schedule cost support company).  We grant the Application subject to the continued application of the mixed support condition to Climax and to all affiliated cost companies.  *See Climax Public Notice*, 36 FCC Rcd at 16151, n.4.

[41] *See T-Mobile-Sprint Order*, 34 FCC Rcd at 10671, para. 214; *CenturyLink-Level 3 Order*, 32 FCC Rcd at 9604, para. 50 (citing *AT&T Inc. and BellSouth Corporation Application for Transfer of Control*, Memorandum Opinion and Order, 22 FCC Rcd 5662, 5761, para. 202 (2006)); *AT&T-DIRECTV Order*, 30 FCC Rcd at 9327, paras. 273-74.

only receiving Lifeline services must offer the Lifeline discount to qualifying households.  *See* 47 CFR § 54.101(d); *see also* 47 CFR part 54, subparts D, K, L, M.  The Lifeline program provides support to reimburse providers for offering phone, broadband, or bundled services at discounted prices to qualifying low-income households, with enhanced support available for households residing on Tribal lands.  47 CFR §§ 54.401(a), 54.403(a).  Eligible services include voice and broadband Internet access service meeting certain requirements.  *See* 47 CFR § 54.408.

expansion of those fiber networks."[42]  Applicants further assert that the Proposed Transaction will result in Licensees being "better able to meet the needs of their [CLEC] and [ILEC] customers, as well as to compete for new customers—driving growth that will enhance competition and make high-capacity fiber connections available to more customers in the Licensees' current operating areas in Licensees' Territory and other areas into which MetroNet Systems and its subsidiaries may expand in the future."[43]

In addition, T-Mobile reports that it has had very productive discussions with NATE: The Communications Infrastructure Contractors Association over the last several months on topics related to tower construction and maintenance.[44]  T-Mobile commits to institute updates to certain practices related to pricing, master service agreements, third party vendors and operational mandates, workforce integrity, and turf vendor models, and to continue constructive dialogue with NATE and its members.[45]  We accept T-Mobile's commitment as firm and definite, and expect that it will help ensure that the post-transaction company will have fair and secure market practices that will benefit the public and strengthen services for all customers.

We also recognize T-Mobile's commitment to equal opportunity employment and nondiscrimination as strengthening its investment and service quality efforts.[46]  T-Mobile states it is modifying its practices, including its leadership and public messaging; hiring and recruitment; career development, mentorship, and training; supplier and vendor diversity, corporate sponsorships, and memberships; and employee resource groups.[47]  We accept T-Mobile's commitment to modify its practices as firm and definite, and expect that these changes to eliminate DEI practices will prevent discrimination in the post-transaction company, as consistent with the law and the public interest.

The Commission has specified that ensuring consumers receive new or additional services is an important public interest factor,[48] and accelerating private sector deployment of advanced services is one of the aims of the Act.[49]  In light of MetroNet Systems' commitments to meet all of its federal high-cost support obligations[50] and potentially greater ability to timely expand its fiber network, we find it likely that the Proposed Transaction would result in some public interest benefits.  Overall, we find that the Proposed Transaction will result in public interest benefits and therefore serves the public interest, convenience, and necessity.

---

[42] Application at 7.

[43] *Id.* at 7, 9.

[44] Letter from Mike Simpson, SVP & Chief Procurement Officer, T-Mobile US, Inc., to Marlene H. Dortch, Secretary, FCC, WC 24-244, GN 24-286 (filed July 8, 2025).

[45] *Id.*

[46] *See* Letter from Mark W. Nelson, Executive Vice President & General Counsel, T-Mobile US, Inc., to Hon. Brendan Carr, Chairman, FCC, WC 24-244, GN 24-286 (filed July 8, 2025).

[47] *See id.* at 2-4.

[48] *See, e.g., AT&T-DIRECTV Order*, 30 FCC Rcd at 9140, para. 19.

[49] *See, e.g., Application of Verizon Communications Inc. and América Móvil S.A.B. de C.V. for Consent to Transfer Control of International Section 214 Authorization*, GN Docket No. 21-112, IBFS File No. ITC-T/C-20200930-00173, Memorandum Opinion and Order, 36 FCC Rcd 16994, 17002, para. 22 (2021) (citing 47 U.S.C. §§ 254, 332(c)(7), 1302; Telecommunications Act of 1996, Pub. L. No. 104-104, Preamble, 110 Stat. 56 (1996) (one purpose of the Act is to "accelerate rapidly private sector deployment of advanced telecommunications and information technologies and services")).

[50] Sept. 18 Supplement at 1.

**National Security, Law Enforcement, Foreign Policy and Trade Policy Concerns**

When analyzing a transfer of control, assignment application, or petition for declaratory ruling that includes foreign investment, we also consider public interest issues related to national security, law enforcement, foreign policy, or trade policy concerns.[51] As part of our public interest analysis, the Commission coordinates with the relevant Executive Branch agencies that have expertise in these particular issues.[52] The Commission accords deference to the expertise of these Executive Branch agencies in identifying issues related to national security, law enforcement, foreign policy, or trade policy concerns raised by the relevant Executive Branch agencies.[53] The Commission, however, ultimately makes an independent decision on the application based on the record in the proceedings.[54]

Pursuant to Commission practice, the Application was referred to the relevant Executive Branch agencies for their review of any national security, law enforcement, foreign policy, or trade policy concerns related to the foreign ownership of the Applicants.[55] On September 30, 2024, the U.S. Department of Justice (DOJ), on behalf of the Committee for the Assessment of Foreign Participation in the United States Telecommunications Services Sector (Committee), informed the Commission that the Committee was reviewing the Application for any national security and law enforcement concerns that may be raised by foreign participation in the United States telecommunications services sector and requested that the Commission defer action on the Application.[56] We deferred action in response to this request from the Committee. On February 12, 2025, DOJ notified the Commission that the Committee was conducting a 120-day initial review to assess whether granting the Application would pose a risk to

---

[51] *See Process Reform for Executive Branch Review of Certain FCC Applications and Petitions Involving Foreign Ownership*, IB Docket 16-155, Report and Order, 35 FCC Rcd 10927 (2020) (setting rules and procedures for referring applications for Executive Branch review consistent with Executive Order No. 13913) (*Executive Branch Review Order*); *Rules and Policies on Foreign Participation in the U.S. Telecommunications Market; Market Entry and Regulation of Foreign-Affiliated Entities*, Report and Order and Order on Reconsideration, 12 FCC Rcd 23891, 23918-21, paras. 59-66 (1997) (*Foreign Participation Order*), *recon. denied*, 15 FCC Rcd 18158 (2000) (in opening the U.S. telecommunications market to foreign entry in 1997, the Commission affirmed that it would consider national security, law enforcement, foreign policy, and trade policy concerns related to reportable foreign ownership as part of its overall public interest review of applications for international section 214 authority, submarine cable landing licenses, and declaratory rulings to exceed the foreign ownership benchmarks of section 310(b) of the Act); *see also T-Mobile/Sprint Order*, 34 FCC Rcd at 10732-33, para. 349.

[52] *See Executive Branch Review Order*, 35 FCC Rcd at 10935-36, paras. 17, 24.

[53] *Id.* at 10930, para. 7 (citing *Foreign Participation Order*, 12 FCC Rcd at 23920-21, paras. 65-66; *Amendment of the Commission's Regulatory Policies to Allow Non-U.S. Licensed Space Stations to Provide Domestic and International Satellite Service in the United States; Amendment of Section 25.131 of the Commission's Rules and Regulations to Eliminate the Licensing Requirement for Certain International Receive-Only Earth Stations*, IB Docket No. 96-111, CC Docket No 93-23, RM-7931, Report and Order, 12 FCC Rcd 24094, 24171-72, paras. 179, 182 (1997)); *see also T-Mobile/Sprint Order*, 34 FCC Rcd at 10733, paras. 349; *Review of Foreign Ownership Policies for Broadcast, Common Carrier and Aeronautical Radio Licensees under Section 310(b)(4) of the Communications Act of 1934, as Amended*, Report and Order, 31 FCC Rcd 11271, 11277, para. 6 (2016), *Pet. for recon. dismissed*, 32 FCC Rcd 4780 (2017).

[54] 47 CFR § 1.40001(b) ("The Commission will consider any recommendations from the [E]xecutive [B]ranch on pending application(s) . . . that may affect national security, law enforcement, foreign policy, and/or trade policy as part of its public interest analysis. The Commission will evaluate concerns raised by the [E]xecutive [B]ranch and will make an independent decision concerning the pending matter.").

[55] *See Public Notice* at 4-5.

[56] Letter from Makenzie B. Skopowski, Attorney Advisor, U.S. Department of Justice, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 24-244; ITC-ASG -20240808-00133; ITC-T/C-20240808-00130; ITC-T/C-20240808-00131; ITC-T/C-20240808-00132, and Attach. (filed Sept. 30, 2024).

national security or law enforcement interests of the United States.[57]

On June 5, 2025, NTIA, on behalf of the Committee, submitted the Committee Petition.[58]  In the Committee Petition, the Committee advises that it has no objection to the Commission granting the Application, provided that the Commission conditions its consent on compliance by MetroNet Systems with the commitments and undertakings set out in the May 9, 2025, Letter of Agreement (LOA), which NTIA filed with the Committee Petition.[59]

In accordance with the request of NTIA and the Committee, and in the absence of any objection from the Applicants, we grant the Committee Petition.  Accordingly, we condition grant of the Application on compliance with the commitments and undertakings set forth in the LOA.[60]  A failure to comply with and/or remain in compliance with any of the provisions of the LOA shall constitute a failure to meet a condition of this grant and the underlying authorizations and thus grounds for declaring the underlying authorizations terminated without further action on the part of the Commission.  A failure to meet a condition of this grant and the underlying authorizations may also result in monetary sanctions or other enforcement action by the Commission.

**Grant of Application and Committee Petition**

We find, upon consideration of the record, that the proposed transfer will serve the public interest, convenience, and necessity.[61]  This grant of the Application is conditioned as set out in this Public Notice.

Therefore, pursuant to section 214 of the Act, 47 U.S.C. § 214, and sections 0.91, 0.291, and 63.04 of the Commission's rules, 47 CFR §§ 0.91, 0.291, and 63.04, the Bureau hereby grants the Application discussed in this Public Notice, subject to Applicants' compliance with all applicable obligations.

---

[57] Letter from Makenzie B. Skopowski, Attorney Advisor, U.S. Department of Justice, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 24-244; ITC-ASG -20240808-00133; ITC-T/C-20240808-00130; ITC-T/C-20240808-00131; ITC-T/C-20240808-00132, and Attach. (filed Feb. 12, 2025).

[58] National Telecommunications and Information Administration, *Petition to Adopt Conditions to Authorization and License*, WC Docket No. 24-244; ITC-ASG -20240808-00133; ITC-T/C-20240808-00130; ITC-T/C-20240808-00131; ITC-T/C-20240808-00132, and Attach. (filed June 5, 2025) (Committee Petition).

[59] Letter from Dave Heimbach, President and Chief Executive Officer, Metronet Holdings and Subsidiaries and MetroNet Systems Holdings, LLC and Felix Boyeux, Manager and Vice President, KKR Mercury Parent LLC to Chief, Foreign Investment Review Section (FIRS) and Deputy Chief, Compliance and Enforcement (FIRS), on behalf of the Assistant Attorney General for National Security, United States Department of Justice, National Security Division and U.S. Department of Homeland Security, Under Secretary for Strategy, Policy and Plans, Office of Strategy, Policy, and Plans (dated May 9, 2025).

[60] *T-Mobile/Sprint Order*, 34 FCC Rcd at 10732-33, para. 349; *Foreign Participation Order*, 12 FCC Rcd at 23918-21, paras. 59-66.

[61] *See* 47 U.S.C. § 214(a).  The Commission has not found significant competitive harm in certain transactions involving the combination of providers where the transaction did not reduce competition and resulted in a stronger competitor.  *See, e.g.*, *CenturyLink/Level 3 Order*, 32 FCC Rcd at 9594, 9605, paras. 26 and 52 (finding no harm to competition in CenturyLink's incumbent LEC territory, nor outside of CenturyLink's incumbent LEC territory, where applicants operate as competitive LECs, and further finding that the transaction "will expand the on-net reach of the newly combined firm resulting in a more effective and stronger competitor against larger cable and incumbent LEC competitors, among others, particularly outside of Century Link's incumbent LEC region, where it, like Level 3, operates as a competitive LEC."); *Joint Applications of Telephone and Data Systems, Inc. and Chorus Communications, Ltd. For Authority to Transfer Control of Commission Licenses and Authorizations Pursuant to Sections 214 and 310(d) of the Communications Act and Parts 22, 63 and 90 of the Commission's Rules*, Memorandum Opinion and Order, 16 FCC Rcd 15293, 15296-99, para. 9-10 (CCB/WTB 2001) (granting a transfer of control involving an incumbent LEC and an affiliate of an in-region provider of wireless services where the overlap was limited in size and the transaction overall resulted in stronger competitor).

Pursuant to section 1.103 of the Commission's rules, 47 CFR § 1.103, the grant is effective upon release of this Public Notice.[62]  Petitions for reconsideration under section 1.106 or applications for review under section 1.115 of the Commission's rules, 47 CFR §§ 1.106, 1.115, may be filed within 30 days of the date of this Public Notice.

Pursuant to sections 4(i)-(j) and 214(a), of the Communications Act of 1934, as amended, 47 U.S.C. §§ 154(i)-(j) and 214(a), and section 63.04 of the Commission's rules, 47 CFR § 63.04, we grant the Committee Petition filed by NTIA.  Grant of the Application is conditioned upon compliance by the Applicants with the LOA from Dave Heimbach, President and Chief Executive Officer, Metronet Holdings and Subsidiaries and MetroNet Systems Holdings, LLC and Felix Boyeux, Manager and Vice President, KKR Mercury Parent LLC to Chief, Foreign Investment Review Section (FIRS) and Deputy Chief, Compliance and Enforcement (FIRS), on behalf of the Assistant Attorney General for National Security, United States Department of Justice, National Security Division; and U.S. Department of Homeland Security, Under Secretary for Strategy, Policy and Plans, Office of Strategy, Policy, and Plans (dated May 9, 2025).  Any failure to comply and/or remain in compliance with any of the conditions set out in this Public Notice shall constitute a failure to meet a condition of the grant and the underlying authorizations and thus grounds for declaring the authorizations terminated without any further action on the part of the Commission.  Failure to meet a condition of the grant and the underlying authorizations may also result in monetary sanctions or other enforcement action by the Commission.

For further information, please contact Dennis Johnson, Wireline Competition Bureau, Competition Policy Division, (202) 418-0809.

**-FCC-**

---

[62] We direct Applicants to submit, within 90 days of closing the Proposed Transaction, a notice in WC Docket No. 24-244 that the Proposed Transaction has closed and the consummation date of this transaction, and also provide a courtesy copy of the notice to hcinfo@usac.org.